Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# OPINION

Nos. 04-09-00684-CR
04-09-00685-CR

Keith **ALFARO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 6, Bexar County, Texas
Trial Court Nos. 223315, 223316
Honorable Phil Chavarria, Jr., Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Karen Angelini, Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:  October 6, 2010

AFFIRMED

Keith J. Alfaro was charged with assault with bodily injury, resisting arrest, and evading arrest. The jury found him not guilty on the assault with bodily injury charge, but guilty on the resisting arrest and evading arrest charges. Alfaro appeals his convictions and, in one issue, contends the trial court erred in denying his requested charge on the defense of mistake of fact. We find no error and affirm the trial court's judgments.

**STANDARD OF REVIEW**

In reviewing jury charge error, we first determine whether there is error in the jury charge. *Durden v. State*, 290 S.W.3d 413, 415 (Tex. App.—Texarkana 2009, no pet.). If we find error, then we determine whether the error was the subject of a timely objection in the trial court. *Id*. If there was a timely objection, as there was in this case, then we reverse if the error was calculated to injure the rights of the defendant. *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006) and *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).

**MISTAKE OF FACT DEFENSE TO RESISTING AND EVADING ARREST**

The Texas Penal Code provides that "[it] is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE ANN. § 8.02(a) (West 2003).

"[A]n accused has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the defense." *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). The defendant's testimony alone may be sufficient to raise the issue and warrant a requested defensive instruction. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). In reviewing whether the trial court erred in refusing to submit a requested defensive instruction, we must examine the evidence offered in support of that defensive issue in the light most favorable to the defense. *Durden*, 290 S.W.3d at 416. When evidence from any source raises a defensive issue, and the defendant properly requests a jury charge on that issue, the trial court must submit the issue to the jury. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).

With regard to the offense of resisting arrest, the Texas Penal Code provides that "[a] person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another by using force against the peace officer or another." TEX. PENAL CODE ANN. § 38.03(a) (West 2003). With regard to the offense of evading arrest, the Texas Penal Code provides that "[a] person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him." *Id.* 38.04(a).

At trial, Alfaro requested the following instruction on mistake of fact as to both resisting arrest and evading arrest:

> Therefore, if you believe from the evidence that on the occasion in question the defendant, through mistake, formed a reasonable belief that he was not "under arrest," as that term is used in the charge, or if you have a reasonable doubt thereof, then you will find the defendant [n]ot [g]uilty.

### THE EVIDENCE PERTAINING TO RESISTING AND EVADING ARREST

At trial, Tamara Vaughan testified that on July 22, 2007, she was spending time at the community pool in the Trinity Oaks subdivision where she lived. She was accompanied by several family members. When Vaughan became bothered by the smell of a cigar, she asked the man who was smoking the cigar, to put it out. The man smoking the cigar was Alfaro, an off-duty city police officer. He was standing and talking on his phone when she approached him. According to Vaughan, Alfaro argued with her and used racial slurs. He then punched her in the face, and she fell to the ground. She could not get up because he continued to punch her and choke her. At that point, Vaughan's cousin jumped on Alfaro's back to try to get him off of Vaughan. Alfaro then left the pool area. Vaughan and her family members got into a car driven by Vaughan's grandmother and began looking for Alfaro. They did find him, and he told them he

was a police officer and that he was going to call the police. Vaughan testified that the police did arrive, and she showed them her injuries. An ambulance then arrived and took her to the hospital.

Vaughan's cousin, Tylia Hopkins, testified that she was at the swimming pool with Vaughan on the day in question. She saw Vaughan approach Alfaro, who was smoking a cigar and talking on his cell phone. Alfaro started yelling at Vaughan, and then he hit her in the face. Hopkins then ran over and jumped on top of Alfaro as Alfaro was choking Vaughan. Her grandmother then came to pick up the family members from the pool. They drove to where Alfaro and another man were standing in a cul-de-sac. The police arrived and they tried to arrest Alfaro.

Vaughan's grandmother, Dina Bushrod, also testified about the events in question. She drove to the swimming pool to pick up Vaughan and other family members. She saw that Vaughan's face was red and her lip was bleeding. After Vaughan and the other family members got in the car, she began looking for Alfaro, the man who had beaten Vaughan. She located him in a cul-de-sac behind the swimming pool. Alfaro was standing there along with one or two other men. One of the other men told her Alfaro was a police officer. Bushrod then went to look for a woman who had witnessed the altercation at the pool. According to Bushrod, the police then arrived. She gave a statement, and then the police talked to Alfaro. Alfaro then turned around and left.

Bexar County Sheriff's Deputy Jesse Padilla testified that he responded to the incident in question. The dispatcher informed him the incident involved an assault and an off-duty city officer. When he arrived, Alfaro was standing on a sidewalk adjacent to the pool and was waving him down. Alfaro said he had called the incident in and was a city officer. A car then drove up, and Alfaro told Deputy Padilla the other person involved in the incident was in the car. Deputy

Padilla then asked Alfaro to tell him about the incident. According to Deputy Padilla, Alfaro reported he had been at the community pool when a female approached him and began to yell at him because he was smoking a cigar. Alfaro told Deputy Padilla that he told the woman "that she didn't know who the f— she was talking to, that he was a f—ing Po-Po and that she just needed to go back to the East Side where she belonged." According to Deputy Padilla, Alfaro said that because the woman would not back up, he walked up to her and punched her in the face. Further, once she dropped to the ground, he got on top of her and began to punch her several times. When Deputy Padilla asked Alfaro what the woman did to provoke him, he said, "Nothing." Deputy Padilla testified that he could not believe what Alfaro was telling him about the incident so he asked Alfaro to repeat what he had said. Alfaro then repeated what had happened, word-for-word. According to Deputy Padilla, he decided to get all the facts before making an arrest. A Hill Country Village police officer arrived, so Deputy Padilla asked that officer to stay with Alfaro while he questioned the other people involved in the incident.

Deputy Padilla walked over to Vaughan, Hopkins, and Bushrod. Vaughan and Hopkins appeared physically shaken, they were crying, and their hair was in a mess. Vaughan's blouse was pulled loose like she had been in a struggle. Her eyes were bloodshot, and she had been crying. There was a bruise on her face and forehead and redness to her throat. He then called for medical assistance for Vaughan. Deputy Padilla testified that he called his supervisors because a city officer was involved, and he wanted them to make the call on the arrest. After talking with his supervisors, he felt the appropriate action was to arrest Alfaro. After his supervisors advised him to arrest Alfaro, he walked over to Alfaro and proceeded to place him under arrest. According to Deputy Padilla, he told Alfaro he was placing him under arrest. Alfaro asked what he was being arrested for, and Deputy Padilla responded, "For assault." Deputy Padilla stated to

Alfaro that Alfaro had said he had punched Vaughan. At that point, according to Deputy Padilla, Alfaro changed his story and said he had hit Vaughan because he felt threatened. Deputy Padilla then tried to restrain Alfaro. He grabbed Alfaro's right wrist in an attempt to handcuff Alfaro. At that point, Alfaro said, "You're not going to f—ing arrest me. You're not going to f—ing put me in that patrol car, and there's no f—ing way you're going to get me in that patrol car." Alfaro then jerked away from Deputy Padilla and pushed his arm toward Deputy Padilla. The deputy lost his balance off the sidewalk and landed in the street, still standing. Alfaro then jerked away from Deputy Padilla. At first, Alfaro began to run away, but then he stopped. According to Deputy Padilla, he told Alfaro to stop and told him he was making matters worse. Alfaro then proceeded down the cul-de-sac at a slow jog. As Deputy Padilla began walking toward Alfaro, Alfaro picked up his pace and began to run. He ran into a house, which Deputy Padilla later discovered was Alfaro's residence. Deputy Padilla followed Alfaro, and they communicated through the window. Deputy Padilla told Alfaro to step out and turn himself in. Alfaro again said Deputy Padilla was not going to arrest him. According to Deputy Padilla, he backed away from the house because he was concerned that Alfaro might have weapons in the house. He called his supervisors and advised them of the situation. Deputy Padilla's supervisors arrived at the scene and decided it was safer to leave the location and obtain an arrest warrant.

Officer Kim Fieldhausen, who was employed by Hill Country Village at the time of the incident, testified that he responded to the incident in question as a back-up to the Bexar County Sheriff's Office. When he arrived, he made contact with Deputy Padilla. He saw Vaughan sitting on the curb, and he noticed her face was red and swollen. Officer Fieldhausen was requested to get identification information from Alfaro, so he proceeded to do so. Alfaro explained to Officer Fieldhausen that he had been at the pool when a lady started arguing with him and pushed him.

Then another female jumped on his back, and Alfaro said he was trying to defend himself. Alfaro identified himself as a police officer. Deputy Padilla then told Officer Fieldhausen he wanted to talk to Alfaro. According to Officer Fieldhausen, when Deputy Padilla started to handcuff Alfaro, Alfaro swung his arm away and told Deputy Padilla he was not going to arrest him. Alfaro then started running, and the officers ran after him. As Officer Fieldhausen was running after Alfaro, he yelled, "Stop" at least twice. Alfaro did not stop, but instead ran into a house. A sheriff's office lieutenant arrived and told the officer to leave the scene.

Bexar County Sergeant Yvonne Vann testified that on the day of the incident in question she spoke with Deputy Padilla by telephone and determined that she needed to go to the scene herself. Before she arrived, she told Deputy Padilla to detain Alfaro until she arrived so she could better assess what was going on. Based on the information she had, she felt there was a need to make an arrest. When she arrived, Sergeant Vann spoke with Deputy Padilla. She did not speak with Alfaro because he was inside his residence. She knocked on the door and spoke to him, but he never responded. After speaking with her supervisors, the decision was made to de-escalate the scene and leave. An arrest warrant was issued the following day.

Lieutenant Scott Bell with the San Antonio Police Department testified that he was involved in a three-way telephone conversation with Alfaro and Sergeant Trevino on the day of the incident. According to Lieutenant Bell, Alfaro was under a lot of stress at the time and was concerned about what he should do. Alfaro did not tell Lieutenant Bell that the sheriff's office had attempted to place him under arrest. Alfaro said he had been compliant in identifying himself and then walked to his house. From what Lieutenant Bell heard, it seemed there was a little confusion as to what was exactly happening, but there was never any kind of physical altercation or attempt to take custody of Alfaro or any resistance by Alfaro to being arrested. Lieutenant

Bell eventually spoke with Bexar County Sheriff supervisors, and the decision was made to leave the scene. Lieutenant Bell was never told that Alfaro had a struggle or altercation with one of the deputies.

Alex Tovar, a neighbor and friend of Alfaro's, testified he was in his yard when the incident occurred. He observed Alfaro and his family returning from the pool. Alfaro's family went inside their home, but Alfaro remained outside with Tovar until the police arrived. When the police arrived, they first spoke to Vaughan and her family. Alfaro then approached the police and spoke to them. Alfaro was talking on his cell phone and walked away from the police officers. The officers did not attempt to subdue him or chase him. Alfaro then went to speak to the officers again. According to Tovar, Alfaro then walked down the sidewalk to his house. The sheriff's deputy followed him. Neither the deputy nor Alfaro was running, jogging, or walking fast. The officer gave no commands to stop and could have easily caught Alfaro if he had wanted to. Alfaro went inside his house, and the officer knocked on the door and asked Alfaro to come outside.

Alfaro testified that at the time of the incident in question he was a robbery detective with the San Antonio Police Department. According to Alfaro, he and his family were at the neighborhood swimming pool, and Alfaro was talking on his cell phone, when Vaughan walked toward him aggressively. She stomped up to him, got directly in his face, and said, "You're going to put that f—ing cigar out." As he tried to back away, she continued to confront him. They began to argue, and Vaughan tried to punch him. Alfaro then punched Vaughan on her cheek. He tried to subdue her, but nothing worked. They tussled and then fell to the ground. She continued to punch him, and he was trying to calm her down. At that point, another female jumped on his back. After they got up off the ground, Vaughan came at him again and they got

into another wrestling match. Alfaro was able to fend Vaughan off, but she started making death threats at him. Alfaro and his family then left the pool area. His family went in the house, but he remained outside. Alfaro then called the police and told them he had been assaulted at the pool.

When Deputy Padilla arrived, Alfaro told him what had happened. Deputy Padilla then left to go speak with Vaughan and her family. Officer Fieldhausen then arrived, and Alfaro spoke with him. According to Alfaro, Deputy Padilla never tried to detain him, never tried to arrest him, never put his hands on him, and never told Alfaro he was going to arrest him. Deputy Padilla said he would contact his supervisor, and Alfaro agreed to contact his own supervisor. Alfaro then walked home. No one tried to stop him or arrest him. After he went into his house, Deputy Padilla came to his door and told Alfaro he was making it hard on himself. Alfaro was on the phone with Sergeant Trevino and told Deputy Padilla that Sergeant Trevino would like to talk to him. Deputy Padilla then wrote down Sergeant Trevino's number, and Alfaro never saw him again. Alfaro did not believe he committed any offense. The next thing Alfaro knew everyone was gone. The following morning, Alfaro was notified that he needed to go downtown and turn himself in and he did so.

## DISCUSSION

On appeal, Alfaro contends he was entitled to a jury instruction on mistake of fact. Specifically, Alfaro argues the degree of culpability necessary to obtain a conviction on evading arrest required the State to show Alfaro fled from Deputy Padilla knowing Deputy Padilla was a peace officer attempting to lawfully arrest and detain him. With regard to the resisting arrest allegation, Alfaro urges the degree of culpability necessary to obtain a conviction required the State to show Alfaro intentionally prevented and obstructed Deputy Padilla from arresting Alfaro. In other words, according to Alfaro, he was entitled to a mistake of fact instruction since

there was some evidence that Alfaro acted under the mistaken belief that Deputy Padilla was not trying to arrest him.

The State counters that the evidence before the trial court did not raise the defense of mistake of fact because Alfaro made no claim that he was mistaken about any fact. Instead, according to the State's argument, Alfaro claimed Deputy Padilla did not attempt to arrest him, never told him he was under arrest, never touched him, and further, that he never ran away from Deputy Padilla. In short, the testimony is conflicting—Deputy Padilla testified he tried to arrest Alfaro and that Alfaro resisted and ran away, whereas Alfaro testified Deputy Padilla never tried to arrest him, he never resisted arrest, and he did not run away from Deputy Padilla. We agree with the State that the evidence did not raise a mistake of fact on Alfaro's part but that there was merely conflicting evidence.

The mistake of fact defense would only apply if Alfaro's mistake affected his culpable mental state regarding commission of the offenses. *See Durden*, 290 S.W.3d at 416 (concluding the trial evidence required a defensive instruction on mistake of fact). For instance, in *Durden*, the accused was charged with theft of copper wire. According to the accused, he was walking across a vacant lot when he found a wheelbarrow filled with copper wire. *Id*. He testified he thought the wire was abandoned. *Id*. The Texarkana court found that the accused's mistaken belief that the wire was abandoned was some evidence that, if believed, would negate the element of theft that the accused intended to deprive the rightful owner of the property. *Id*. at 419.

Similarly, the Court of Criminal Appeals found that the accused was entitled to a mistake of fact instruction where he was charged with unauthorized use of a motor vehicle, but claimed that an acquaintance had given him the keys so he could borrow the vehicle. *Lynch v. State*, 643

S.W.2d 737, 738 (Tex. Crim. App. 1983). In other words, because he mistakenly believed he had permission to drive the vehicle, he was entitled to a mistake of fact instruction. *See id.*

As previously stated, Alfaro does not claim he mistakenly believed Deputy Padilla did not try to arrest him, but rather that Deputy Padilla, in fact, did *not* try to arrest him. Whether Deputy Padilla did or did not attempt to arrest Alfaro was a fact issue for the jury to decide.

Accordingly, we find no error in the trial court's refusal to provide the jury with a mistake of fact instruction. We affirm the trial court's judgments.

Karen Angelini, Justice

PUBLISH